**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **JIMMY GARDENHIRE,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 15-cv-4914-DDC-KGS** |
| **JOHNS MANVILLE,** | |
| **Defendant.** | |

**MEMORANDUM AND ORDER**

### I.      Background

Plaintiff Jimmy Gardenhire brings this employment action against his former employee, Johns Manville.  Plaintiff alleges that defendant failed to provide him with reasonable accommodations in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.  Plaintiff also alleges that defendant retaliated against him for exercising his rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*, and interfered with his FMLA rights when it failed to restore him to his job.  Finally, plaintiff alleges that defendant discriminated against him on the basis of race in violation of Title VII, 42 U.S.C. § 2000e *et seq*. This matter comes before the court on defendant's Motion for Summary Judgment (Doc. 35). Plaintiff responded (Doc. 39) and defendant replied (Doc. 43).  For reasons explained below, the court grants defendant's motion.

### II.      Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When applying this standard, the court views the evidence and draws

inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannaday*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, "the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). "Unsubstantiated

allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id*. (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Uncontroverted Facts

Plaintiff filed an affidavit contesting many of defendant's statements of fact. Plaintiff's affidavit includes immaterial information as well as information that contradicts prior sworn testimony in his deposition. The Tenth Circuit has held that courts should "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). This is because "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Id.* "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* These factors convince the court that plaintiff's affidavit should be disregarded in determining the motion for summary judgment. None of the statements in plaintiff's affidavit are based on newly discovered evidence, nor do they attempt to explain confusion from his

deposition.  Instead, plaintiff's affidavit makes several conclusory statements that contradict his prior testimony in an apparent attempt to create a genuine issue of material fact.  Under these circumstances, the court concludes this is an instance, albeit a rare one, where conflicting testimony between the deposition and the affidavit raises only sham issues.  Accordingly, the court does not consider these contradictory statements in deciding this motion.

The remaining relevant and uncontroverted facts are laid out below; where controverted, the facts are stated in the light most favorable to plaintiff as the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Defendant Johns Manville manufactures residential and commercial fiberglass insulation. Plaintiff worked for defendant at its McPherson, Kansas plant from 2007 through August 2013. Plaintiff worked as an Inspector Packer.

Throughout his employment, plaintiff understood that defendant had policies prohibiting discrimination, harassment, and retaliation.  Defendant maintained a FMLA policy in its handbook and on its website throughout plaintiff's employment.  No one ever showed plaintiff the policy.  Nonetheless, plaintiff utilized FMLA leave at least twice while employed by defendant.  First, plaintiff used FMLA leave when his child was born.  Later, plaintiff used FMLA leave when he became disabled.

At defendant's McPherson plant, fiberglass material is formed and cured into sheets between 48 inches and 15 to 23 feet long.  The length of the sheet depends on the order being filled.  Once the sheets are formed and cured, they travel down a conveyor belt and are inspected for quality.  Once inspected, the sheets are mechanically wound into rolls.  The rolls ranged anywhere from 48 inches 15 to 23 feet long.  The 48 inch rolls weighed merely ounces, and heavier products weighed between 15 and 30 pounds.  Once wound, the roll continues down the

conveyor belt and it is inspected a second time.  After it is inspected the second time, each roll is moved manually from the conveyor belt to the encapsulation machine for packaging.

As an Inspector Packer, plaintiff performed assembly line work on rotating, 12 hour shifts.  Generally, Inspector Packers are responsible for inspecting the insulation sheets before and after they are wound, physically moving all insulation rolls into the packing machine, and running the packing equipment.  While plaintiff worked for defendant, defendant's written description for Inspector Packers listed the essential job functions of the position.  One of these essential functions was "sets aside defective material for disposition by others."  Doc. 36-1 at 19.  Plaintiff's job duties thus required him to lift and throw insulation product if it was defective— which could weigh anywhere from 25 to 55 pounds—sometimes with both hands.  Plaintiff testified that the material was sometimes lighter, and so he could carry the material with one hand.  *Id.* at 22.

In 2007, less than three months after plaintiff started working for defendant, defendant allowed plaintiff to use FMLA leave even though he was not yet eligible.  Then, in late 2011 and early 2012, plaintiff took additional FMLA leave.  *Id.* at 33–34.

On December 30, 2012, plaintiff suffered several injuries when he fell at a skating rink, including a broken elbow.  On December 31, 2012, Dr. Byron Grauerholz at the Orthopedic Sports Health Clinic of Salina imposed work restrictions on plaintiff, limiting him to light duty, and one-hand jobs.  Plaintiff was approved for both FMLA leave and short-term disability leave effective December 31, 2012.  The short-term disability leave offered under defendant's policies was for six months and ran concurrently with plaintiff's FMLA leave.

Plaintiff's work restrictions—imposed on December 31, 2012—were supposed to last for four weeks.  But plaintiff's physician had not yet released him from his work restrictions by

April 2013.  Plaintiff exhausted his FMLA leave around the end of March 2013.  On April 17, 2013, Dr. James Bogener at the Orthopedic Sports Health Clinic of Salina wrote a work restriction note stating that plaintiff still was restricted to "light duty, one-handed jobs only, no lifting with the left hand for six weeks."  Doc. 36-1 at 45.  Dr. Bogener drafted his April 17, 2013 note, and all subsequent work restriction notes, at plaintiff's request.  Dr. Bogener assigned work restrictions based on plaintiff's own reports about his capabilities.  On June 5, 2013, Dr. Bogener wrote another work restriction note for plaintiff.  It indicated that plaintiff should continue working light duty jobs only, performing only one-handed jobs, and that he should not lift with his left hand for six weeks.

Plaintiff exhausted his short-term disability leave on June 29, 2013.  On July 1, 2013, plaintiff applied for permanent and total disability benefits through The Hartford.  When the application asked him to describe what aspect of his condition rendered him unable to work, plaintiff stated that he was too weak in his elbow and back to lift the weight that his job duties required.  Doc. 36-1 at 51.  When asked what important duties of his job he was unable to perform, plaintiff listed lifting, pulling insulation rolls apart and laying them in the machine, and changing out things where he had to bend his arm forward.  *Id.* at 52.  The Hartford denied plaintiff's claim for permanent and total disability benefits.  Plaintiff appealed, and The Hartford upheld its denial.

On July 29, 2013, Shirley Vawter, defendant's Regional Human Resources Manager, sent plaintiff a letter.  The letter stated, in relevant part:

> I'm sorry over the past several weeks we have not be[en] able to connect on the telephone.  I have been trying to reach you to discuss your current status with the company.  To recap, you went out on medical leave December 30, 2012. . . . Your leave continued to be extended several times until the now current expected return to work date of August 8, 2013.

6

> As we have previously discussed, under our policies, we offer up
> to six month[s] of medical leave. . . . In order to determine what
> further reasonable accommodations we may be able to offer you,
> we require further information from your medical provider.

Doc. 36-14 at 1.  In her letter, Ms. Vawter went on to explain defendant's reasonable

accommodation process and enclosed a "Request for Medical Information for Reasonable

Accommodation" questionnaire for plaintiff's physician to complete.  Dr. Bogener completed the

questionnaire on August 9, 2013.  Dr. Bogener reported that plaintiff still was restricted to one-

handed jobs.  Dr. Bogener also stated that plaintiff's work restrictions needed to continue for six

more weeks, but that he would reassess plaintiff's status on August 21, 2013.

After Ms. Vawter received the completed questionnaire from Dr. Bogener, she began

determining whether defendant could reasonably accommodate plaintiff.  Ms. Vawter reviewed

the job functions of an Inspector Packer.  Ms. Vawter also assessed whether defendant could

accommodate plaintiff by assigning him administrative tasks like copying, but she determined

that defendant did not have enough work of this kind to fill an eight-hour job.  After reviewing

the "Medical Information for Reasonable Accommodation" questionnaire completed by Dr.

Bogener, reviewing the written job descriptions and physical demand assessment of the Inspector

Packer position, and several consultations with management personnel, Ms. Vawter concluded

that defendant could not reasonably accommodate plaintiff.  Ms. Vawter did not contact Dr.

Bogener directly.

Ms. Duerksen works in defendant's Human Resources ("HR") department as a liaison

between HR and defendant's employees.  She testified in her deposition that, as far as she knew,

defendant did not allow any employee to come back to work without a full release from a doctor.

Doc. 39-4 at 7.  But, she also testified that she believed that, when the accident is work-related,

7

defendant sometimes allowed employees with workers' compensation injuries to work with restrictions.  *Id.* at 25.  She also testified that she does not make any decisions about employees' FMLA leave.  *Id.* at 2.  Those decisions are made by defendant's HR manager.  *Id.* at 4.

On August 21, 2013, Dr. Bogener completed another work restrictions note for plaintiff. It stated that plaintiff was still restricted to light duty and one-handed jobs.  Ms. Vawter believed that plaintiff did not have a definite return-to-work date because his expected return date had been pushed back repeatedly.  She decided to terminate plaintiff's employment.  On August 30, 2013, Ms. Vawter sent plaintiff a letter stating the following:

> We have received your request for reasonable accommodation. According to the information provided by your physician, you are not able to lift with your left hand, nor are you able to perform manual tasks.  Given these limitations we cannot reasonably accommodate these limitations.
>
> Since you are unable to return to work, and we have not heard from you, we will be terminating your employment effective today.  Should you becom[e] medically clear and able to work, we encourage you to reapply online for any openings you are qualified for.
>
> Should you have any questions or need assistance, please feel free to contact myself or Janet Duerksen.

Doc. 36-21.  Plaintiff claims that on Sunday, September 1, 2013, two days after he was terminated, Dr. Bogener released him to work without any restrictions.  The only evidence supporting this assertion is a backdated full-release form that Dr. Bogener signed on April 22, 2014—about eight months after defendant had terminated plaintiff's employment.

On October 21, 2013, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission.  In this lawsuit, plaintiff asserts a failure to

accommodate claim under the ADA, retaliation and interference claims under the FMLA, and a race discrimination claim under Title VII.[1]

Plaintiff claims that defendant terminated his employment as retaliation for the FMLA leave he took and that the termination interfered with his entitlement to job restoration under the FMLA. Also, plaintiff claims that defendant discriminated against him by not allowing him to perform one-handed jobs even though it allowed Jimmy Yianakopulos and Lonnie Kent, both who are white, to work while on restrictions. Mr. Yianakopulos worked in a different area than plaintiff. Mr. Yianakopulos worked in the "hot end," which, as plaintiff testified, is "where they mix stuff" and "take samples" to perform product checks. Doc. 39-3 at 8. And, as far as plaintiff knows, Mr. Yianakopulos's work restrictions only prevented him from being on his feet. Doc. 39-3 at 8. Plaintiff speculates that Mr. Yianakopulos's position required him to be on his feet a lot during the day. Doc. 39-3 at 9. Plaintiff also testified that Mr. Kent was allowed to work while on restriction. Doc. 39-3 at 9. Mr. Kent held the same position as plaintiff— Inspector Packer. Plaintiff testified that Mr. Kent broke either his foot or his leg and was in a cast at work. Doc. 39-3 at 9. Plaintiff also testified that Mr. Kent was able to perform all of his duties as an Inspector Packer while in the cast. Doc. 39-3 at 9.

## IV.    Analysis

### A. Plaintiff's ADA Claim

Plaintiff claims that defendant discriminated against him in violation of his rights under the ADA. The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a prima facie case for

---

[1] Plaintiff tries to controvert this fact by asserting that he has asserted six distinct and separate causes of action against defendant. But the pretrial order identifies only these four claims. Doc. 32. "The pretrial order supersedes the pleadings and controls the subsequent course of litigation." *Hullman v. Bd. Of Trs. of Pratt Cmty. Coll.*, 950 F.2d 665, 667 (10th Cir. 1991) (citing Fed. R. Civ. P. 16(e)).

discrimination under the ADA, a plaintiff must show that:  "(1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he was terminated 'under circumstances which give rise to an inference that the termination was based on [his] disability.'"  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997)).

Defendant asserts that plaintiff has not produced evidence to support the second element of the prima facie case, that plaintiff could perform the essential functions of his job with or without accommodations.  Whether an individual is qualified to perform the essential function of his job with or without accommodation is a two-part inquiry:  "(1) whether plaintiff can perform the essential functions of the job; and (2) if he is unable to perform the essential functions of his job, whether any reasonable accommodation by the employer would [have] enable[d] him to perform those functions."  *Gipson v. Bear Commc'ns, LLC*, No. 16-2123-JAR-JPO, 2016 WL 3743106, at *5 (D. Kan. July 13, 2016) (citing *Hawkins v. Schwan's Home Serv. Inc.*, 778 F.3d 877, 887–88 (10th Cir. 2015)).  The analysis whether an individual qualifies as an individual with a disability is made at the time of the employment decision.  *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)).

## 1.  Whether plaintiff could perform the essential function of his job

The first inquiry requires the court to determine whether a reasonable jury could find that plaintiff was able to perform the essential functions of his job when he was terminated.  *See Gipson*, 2016 WL 3743106, at *5; *see also Hawkins v. Schwan's Home Servs., Inc.* 778 F.3d 887, 884 n.5 (10th Cir. 2015) (observing that while whether an employee can perform the

essential functions of the job is a mixed question of law and fact, the district court can make a legal determination that no reasonable jury could find that the plaintiff could perform the essential functions of the job).  "Consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).  And, "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.*

Here, defendant maintained a written description of plaintiff's job— Inspector Packer. Doc. 36-7.  The description lists the essential job functions of an Inspector Packer.  Included is "[p]repare, remove, pack, scrap, or otherwise dispose of, all material coming from the machine" and "[s]et aside defective material for disposition by others."  Doc. 36-7.  Inspector Packers were required to be able to lift 25 to 55 pounds.  Doc. 36-1 at 21 (plaintiff's deposition where he agreed that he was required to be able to lift 25 to 55 pounds to perform his job duties).

The uncontroverted facts establish that when plaintiff was terminated, he medically was restricted from lifting with his left hand and was restricted to performing one-handed jobs. Plaintiff attempts to create a genuine issue of material fact on this issue by citing his own affidavit and deposition testimony.  Plaintiff asserts in his affidavit that the "great majority of the insulation that" he handled in his "regular work was 48 inches long to 15-23 feet long." Doc. 39-2 at 3.  And plaintiff testified in his deposition that his job did not always require him to perform jobs with both hands. Doc. 36-1 at 21.  Plaintiff testified that he sometimes used both hands, and sometimes he used one hand.  Doc. 36-1 at 22.  But plaintiff also testified that there were times when he was required to use two hands to lift the material from one area to the next.  Doc. 36-1 at 22.  In sum, plaintiff's own testimony establishes that he sometimes needed to use both hands

to perform the essential functions of his job.  The court concludes that no reasonable jury could find that plaintiff could perform the essential functions of the job when defendant fired him.

### 2. Whether reasonable accommodations by defendant would have enabled plaintiff to perform his job

The next inquiry for the court is whether a reasonable jury could find that reasonable accommodations would have enabled plaintiff to perform his essential job functions.  "To defeat an employer's motion for summary judgment, the employee must first demonstrate that an accommodation appears reasonable on its face."  *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). The burden of production then shifts to the employer to present evidence of its inability to accommodate.  *Id.*  "If the employer presents such evidence, the employee has the burden of coming forward with evidence concerning [his] individual capabilities and suggestions for possible accommodations to rebut the employer's evidence."  *Id.*  Whether an accommodation is reasonable under the ADA is a mixed question of law and fact.  *Id.*  But the Tenth Circuit consistently has held that an employee's request to be "relieved from an essential function of" the position is not a reasonable accommodation.  *Id.*  "In fact, the ADA does not even require an employer to modify an essential function of an existing position in order to accommodate a disabled employee."  *Id.* at 1123.

Plaintiff asserts three ways defendant could have accommodated him.  First, plaintiff asserts that defendant could have placed him on jobs where he did not need to use his hands. Second, plaintiff asserts that he could have completed one handed jobs.  Finally, plaintiff asserts defendant could have allowed him additional time for medical care.  The court addresses each of his proposed accommodations in the next three subsections.

### a. CPW Machine or working "up-front"

Plaintiff asserts that defendant could have placed him on a "CPW machine," watching the product and adjusting the machine when needed, or let him work "up front." Doc. 36-1 at 69. But these proposed accommodations eliminate, or, at the very least, modify, an essential function of the Inspector Packer position. The written Inspector Packer description lists the essential job functions as "[p]repare, remove, pack, scrap, or otherwise dispose of, all material coming from the machine" and "[s]et aside defective material for disposition by others." Doc. 36-7 at 2. Indeed, plaintiff's testimony concedes that Inspector Packers were required to be able to lift 25 to 55 pounds. Doc. 36-1 at 21. So, allowing plaintiff to work on the CPW machine or "up front" would relieve him from an essential function of his job—moving the defective material. Thus, plaintiff has not established that working staffing the CPW machine and letting plaintiff work "up front" are reasonable accommodations under the ADA.

### b. One-handed jobs

Plaintiff also asserts that defendant could have accommodated him by allowing him to perform one-handed jobs. Doc. 36-1 at 23. But plaintiff also fails to show that performing only one-handed jobs would be a reasonable accommodation.

Even if the court concludes that allowing plaintiff to perform one-handed jobs is a reasonable accommodation on its face, defendant rebuts this possibility with plaintiff's own testimony. Plaintiff testified in his deposition that the Inspector Packer job required some throwing— including "two-handed throwing"— and that he was sometimes required to grab material or insulation and throw it to another location. *Id.* at 22. Indeed, plaintiff's only evidence that using just one hand would be a reasonable accommodation is that he "sometimes" used one hand when he carried insulation that was "a little lighter" or if he was "in a hurry." *Id.*

at 22.  Plaintiff's testimony establishes that the Inspector Packer position sometimes required

using both hands, so a "one-handed only" accommodation eliminates an essential function of the

Inspector Packer position.  And plaintiff does not offer any evidence of individual capabilities

and suggestions for possible accommodations to rebut defendant's evidence.  A "one-handed

only" job is not a reasonable accommodation under the ADA.

### c.   Additional time for medical care

Finally, plaintiff contends that defendant failed to reasonably accommodate him when it

failed to give him additional time for medical care.  And plaintiff contends that defendant has not

demonstrated how extending his leave past August 20, 2013, would "impose undue hardship" on

defendant.  Doc. 39 at 35.  According to plaintiff, "no rule that limited the time that [plaintiff]

could remain off of work," and that his absence did not create any type of problem for defendant.

*Id.* at 36.  Plaintiff also asserts that defendant did not give him any warning that he would be

fired before August 30, 2013, and that he was released to work on September 1, 2013.

The Tenth Circuit has held that "a reasonable allowance of time for medical care and

treatment may, in appropriate circumstances, constitute a reasonable accommodation." *Hudson*

*v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996).  But the employer is not

required to wait indefinitely for recovery.  *See id.* at 1169 (finding no genuine issue of material

fact about whether defendant could have accommodated plaintiff with additional leave because

plaintiff failed to "present any evidence of the expected duration of her impairment as of the date

of her termination").

Plaintiff bases his argument on his medical release form dated April 22, 2014, where Dr.

Bogener retroactively released him to work on September 1, 2013.  And because Dr. Bogener

was "willing to release him retroactively on April 22, 2014, it is much more likely that he had

already done it as of September 2013." Doc. 39 at 37. So, according to plaintiff, additional leave would not have caused defendant undue hardship. The court can find no support for plaintiff's argument. While a "reasonable allowance of time for medical care" may constitute a reasonable accommodation, plaintiff already had received eight months of continuous leave when defendant terminated him. And when defendant terminated him on August 30, 2013, plaintiff had not given defendant any indication about the expected duration of his impairment. Defendant was not required to wait indefinitely for recovery. Under these circumstances, additional time for medical care was not a reasonable accommodation under the ADA.

The court thus concludes that no reasonable jury could find plaintiff could perform the essential functions of the job, even with reasonable accommodations, when defendant fired him.

### 3. Defendant's policy as a "Per se violation"

Plaintiff also asserts that defendant maintained a "100% healed policy" and this policy constitutes a per se violation of the ADA. Doc. 39 at 32. Plaintiff contends that "defendant refuses to allow employees to return to work if they have any restrictions whatsoever even if those restrictions are completely unrelated to the performance of the job." Doc. 39 at 31. The Tenth Circuit has not addressed this issue, but several district courts—including this one—have recognized "that a blanket policy of requiring employees to be '100% healed' before returning to work is a per se violation of the ADA." *Martin v. State*, 996 F. Supp. 1297, 1298 (D. Kan. 1998) (citing *Hammer v. Bd. Of Educ.*, 955 F. Supp. 921, 927 (N.D. Ill. 1997); *Norris v. Allied-Sysco Food Servs., Inc.*, 948 F. Supp. 1418, 1437 (N.D. Cal. 1996); *Heise v. Genuine Parts Co.*, 900 F. Supp. 1137, 1154 n.10 (D. Minn. 1995)).

Assuming that these holdings are correct, the court turns to the operative question on this issue. Has plaintiff come forward with admissible evidence that could support a jury finding that

defendant follows such a policy?  *See, e.g.*, *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).[2]  Limiting the inquiry to trial-admissible evidence means that any testimony plaintiff tenders to support the existence of such a policy must satisfy Fed. R. Evid. 602.  This rule provides, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  Trying to support its claim that defendant applied a "100% healed" policy, plaintiff relies on deposition testimony by Ms. Duerksen.  But when asked directly whether she knew if defendant had any policy limiting an employee's eligibility for time off because of an injury, Ms. Duerksen explained that all she does is "make[ ] the appropriate phone calls."  Doc. 39-4 at 4. Her deposition testimony also explains that she refers all questions about an employee's ability to take time off to her HR manager.  *Id.*  Further, Ms. Duerksen's testimony explicitly contradicts the proposition that plaintiff ascribes to her.  She testified that defendant had allowed employees with worker compensation injuries to work under restrictions when the injury is work related. *Id.* at 25.

The best argument that plaintiff can advance for the "100% healed policy" relies on this testimony from Ms. Duerksen's deposition:  "As far as I know, [defendant does not] allow[ ] an hourly employee to return [to work] with restrictions."  Doc. 39-4 at 7.  While this testimony surely excludes Ms. Duerksen as a witness with the personal knowledge to establish what defendant's policy is, it also fails to provide a basis for a reasonable jury to find that defendant has adopted or applied a "100% healed" policy.  Our Circuit's precedent makes it plain:  "in opposing a motion for summary judgment, the non-moving party 'cannot rest on ignorance of

---

[2] "To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury" at trial.

facts, on speculation, or on suspicion.'" *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quoting *Conway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).

But this is exactly what plaintiff tries to do here.  He contends that Ms. Duerksen's inability to disclaim the existence of a "100% healed" policy constitutes evidence that the policy exists.  Plaintiff's argument thus sidesteps the obligation it owes as the party opposing summary judgment to "bring to the district court's attention some affirmative indication that his version of relevant events" is more than a "fanciful" one.  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  In sum, plaintiff's theory that defendant applies a "100% healed" policy is nothing more than that—a theory.

Plaintiff has failed to adduce any admissible evidence that defendant applied a policy that amounts to a per se violation of the ADA.  No reasonable jury could find for plaintiff on this claim and the court thus grants defendant's Motion for Summary Judgment on plaintiff's ADA claim.

### B.  Plaintiff's FMLA Claims

Plaintiff raises two claims under the FMLA.  First, plaintiff claims that defendant retaliated against him when it fired him for exercising his rights under the FMLA.  Second, plaintiff claims that defendant interfered with his right to reinstatement under the FMLA.

The FMLA allows a qualified employee to take up to 12 weeks of leave during a 12 month period if "a serious health condition . . . makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA makes it unlawful for an "employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided by the FMLA, or to "discriminate against any individual for opposing any practice" prohibited by the FMLA.  *Id.*  § 2615(a)(1)–2.

### 1. Retaliation

The court analyzes plaintiff's retaliation claim under the burden-shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Metzler*, 464 F.3d at 1170. This framework uses a three-step analysis. First, plaintiff must establish a prima facie case of retaliation. *Id.* If plaintiff establishes a prima facie case, the burden then shifts to the defendant, who must provide a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* It then becomes plaintiff's burden to show that the defendant's proffered reason for the challenged action is pretextual. *Id.*

To state a prima facie case of FMLA retaliation, a plaintiff must show:  (1) he engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the adverse action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).

### a. Causal Connection

Defendant contends that plaintiff fails to establish the third element—that a causal connection exists between the protected activity and adverse action.  "The 'critical inquiry' at this prima facie stage is 'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful [retaliation].'" *Id.* (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)).  And, the Tenth Circuit repeatedly has recognized that "temporal proximity between protected conduct and termination" is relevant evidence of a "causal connection sufficient to justify an inference of retaliatory motive." *Id.* (internal quotation marks omitted).  But a plaintiff may rely "on

temporal proximity alone only if 'the termination is *very closely* connected in time to the protected activity.'"  *Id.*  (citing *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original)).

Plaintiff asserts that the temporal proximity between his FMLA leave and his termination gives rise to an inference of unlawful retaliation.  Plaintiff took his 12 weeks of FMLA leave beginning on December 31, 2012.  Plaintiff exhausted his FMLA leave in late March or early April 2013.  But defendant did not fire plaintiff until August 30, 2013.  Nearly five months expired between plaintiff's "protected activity"—taking FMLA leave—and defendant's adverse employment action.  This is insufficient to establish a causal connection.  *See Richmond v. ONEOK,Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming that a three-month period of time between protected activity and termination is insufficient, standing alone, to establish a causal connection).

### b.  Legitimate, nonretaliatory motive

If plaintiff establishes a prima facie case for retaliation, under the *McDonnell Douglas* burden-shifting framework, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *Metzler*, 464 F.3d at 1170.  Here, defendant provides legitimate, non-retaliatory reasons for its actions.

Defendant contends that plaintiff's "work restrictions prevented him from performing the material functions of his Inspector Packer position and that such restrictions could no longer be accommodated in Johns Manville's heavy industrial environment."  Doc. 36 at 31.

Attempting to meet his burden to show that defendant's proffered reasons are pretextual, plaintiff contends he "repeatedly asked defendant to restore him to his position during the 12 weeks that defendant placed him on FMLA that he had not requested."  Doc. 29 at 43.  The

uncontroverted facts will not support this argument.  The uncontroverted facts establish that

plaintiff was injured on December 30, 2012, and that plaintiff was approved for FMLA leave

effective December 31, 2012.  As of April 2013, plaintiff's physician had not yet released him

from his work restrictions.  Dr. Bogener completed the April 17, 2013 work restrictions note, and

all subsequent work restrictions notes, at plaintiff's request.  *See* Doc. 36 at 12; *see also* Doc. 39

at 6–7 (defendant asserts these facts, and plaintiff does not controvert them; "[a]ll material facts

set forth in the statement of the movant will be deemed admitted for the purpose of summary

judgment unless specifically controverted by the statement of the opposing party."  D. Kan. R.

56.1).  Plaintiff relies on defendant's "100% healed policy" for his argument that defendant

interfered with his ability to return to work and asserts that this provides the necessary causal

connection for his retaliation claim.  But, as discussed above, the court concludes that a

reasonable jury could not find that defendant maintained a 100% healed policy.  *See supra*

III.A.3. (discussing plaintiff's "100% healed policy" argument).

Plaintiff cannot establish a prima facie case for retaliation.  So, a reasonable jury could

not find for plaintiff on this issue.  The court thus grants defendant's Motion for Summary

Judgment on plaintiff's FMLA retaliation claims.

## 2.   Interference

Plaintiff next claims that defendant violated his FMLA rights by failing to restore him to

his position.  To establish a FMLA interference claim under § 2615(a)(1), plaintiff must show,

"'(1) that [ ]he was entitled to FMLA leave, (2) that some adverse action by the employer

interfered with h[is] right to take FMLA leave, and (3) that the employer's action was related to

the exercise or attempted exercise of h[is] FMLA rights." *Dalpiaz v. Carbon Cnty*, *Utah*, 760

F.3d 1126, 1132 (10th Cir. 2014) (quoting *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)).

Defendant asserts that plaintiff cannot establish any element required for a prima facie case of FMLA interference. First, defendant contends plaintiff was not entitled to reinstatement. Second, defendant contends plaintiff's termination did not interfere with his right to be reinstated because he did not have a right to be reinstated on the date of his discharge. Finally, defendant contends that it did not fire plaintiff for any reason related to his FMLA leave.

The court agrees with defendant on each point. First, "various courts have held that the right to reinstatement under FMLA expires when FMLA leave expires." *Degraw v. Exide Techs.*, 744 F. Supp. 2d 1199, 1216 (D. Kan. 2010) (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 148 (3d Cir. 2004) (finding that employee was subject to discharge on the first day he was absent from work and no longer protected by FMLA); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161–62 (2d Cir. 1999) (finding no interference claim when plaintiff was unable to perform his job for two months after expiration of his 12-week FMLA period); *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999) (finding that an employee absent for more than a protected time period does not have a right to reinstatement even if the employer provides more leave than required by the FMLA). Plaintiff's FMLA leave expired in late March or early April 2013. Defendant fired plaintiff on August 30, 2012. So, plaintiff has not established that he had a right to reinstatement when he was fired. For the same reasons, plaintiff has not established that his termination interfered with his right to be reinstated. A reasonable jury could not find for plaintiff on this issue. The court thus grants defendant's Motion for Summary Judgment on plaintiff's FMLA claims.

## C.  Race Discrimination

Plaintiff claims that defendant discriminated against him on the basis of race when it fired him, even though defendant allowed Jimmy Yianakopulos and Lonnie Kent, who are both white, to work while on restrictions.  The court analyzes plaintiff's race discrimination claim under the same *McDonnell Douglas* burden-shifting framework discussed above.

To establish a prima facie case for discrimination, plaintiff must demonstrate (1) membership in a protected class; (2) an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Kenfield v. Colo. Dep't of Pub. Health & Env't*, 557 F. App'x 728, 731 (10th Cir. 2014).  The parties do not dispute that plaintiff has established the first two elements.  Defendant contends that plaintiff fails to establish the third element.

Plaintiff asserts that he was treated harshly and, unlike white employees, black employees were assigned the most difficult jobs and were "oppressively supervised."  Doc. 39 at 45.  One way that plaintiff could establish that the adverse employment action occurred under circumstances giving rise to an inference of discrimination is to show that the employer treated similar situated employees more favorably.  *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800–01 (10th Cir. 2007).  "For employees to be similarly situated, they must be similar in all material respects."  *Oppong v. Camelot of Kan.*, No. 12-1276-JTM, 2013 WL 4564818, at *3 (D. Kan. Aug. 28, 2013); *see also Lucero v. Sandia Corp.*, 495 F. App'x 903, 910 (10th Cir. 2012) (holding that a plaintiff claiming discrimination based on low wage raises failed to provide enough evidence of other employees' performance, training, education or skills for the court to find they were similarly situated).  "Material respects" include "injuries, positions, supervisors or available accommodations."  *Howard v. Garage Door Group, Inc.*, 197 F. Supp. 2d 1297, 1307

(D. Kan. 2002); *see also Creason v. Seaboard Corp.*, 263 F. Supp. 2d 1297, 1307 (D. Kan. 2003) (requiring evidence that similarly situated employees had similar job duties).

Here, plaintiff identifies Mr. Yianakopulos and Mr. Kent as similarly situated employees who were treated differently. Both Mr. Yianakopulos and Mr. Kent are white. But the uncontroverted facts also establish that neither Mr. Yianakopulos nor Mr. Kent was similarly situated to plaintiff. Mr. Yianakopulos held a different position than plaintiff, performed different job duties than plaintiff, and worked in a different area than plaintiff. So, Mr. Yianakopulos was not similarly situated to plaintiff. Like plaintiff, Mr. Kent was an Inspector Packer. But, Mr. Kent's injuries were to his foot, and plaintiff testified in his deposition that Mr. Kent was able to perform his duties while his foot was in a cast. So, Mr. Kent was not similarly situated to plaintiff either because plaintiff could not perform his essential job duties. Plaintiff fails to make out a prima facie case of discrimination. A reasonable jury could not find for plaintiff on this issue. The court thus grants defendant's Motion for Summary Judgment on plaintiff's race discrimination claims.

### D.  After-Acquired Evidence Defense

Defendant contends that even if plaintiff could establish wrongful termination, reinstatement, front pay, and back pay are inappropriate remedies because defendant is entitled to summary judgment on its after acquired evidence defense. Defendant cites to *Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1205 (10th Cir. 2015) for support.

In *Zisumbo*, our Circuit held that backpay, front pay, and reinstatement may be limited based on employee's misconduct. Defendant asserts that plaintiff is not entitled to any award because he affirmatively misrepresented that Dr. Bogener released him to work on September 1, 2013, and obtained a backdated release form to support his misrepresentations. Defendant

contends that this amounts to sanctionable discovery abuse and that submission of such false evidence would be fraud on the court.  And, defendant contends that even if it had reinstated plaintiff on September 1, 2013, it would have terminated him for his "egregious fabrications." Doc. 36 at 31.

The court does not need to determine whether plaintiff fabricated evidence to decide this motion and grant summary judgment for defendant.  Whether Dr. Bogener released plaintiff on September 1, 2013, does not affect the outcome of the motion.

### V.      Conclusion

No genuine dispute of material fact exists for plaintiff's ADA, FMLA, or race discrimination claims.  Defendant is thus entitled to summary judgment as a matter of law.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 35) is granted.

**IT IS SO ORDERED.**

**Dated this 2nd day of February, 2017, at Topeka, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**